WILLIAM C. MILLER

v.

IRA M. HARRISON, administrator &c.

On November 22d, 1875, an administrator gave the usual notice to bar creditors in nine months, but the order thereon was not taken until May 29th, 1877. The complainant and two other creditors exhibited their claims within the nine months specified, and all the other creditors, except two, before the order was taken. The estate proving insolvent, the administrator, under the advice of the surrogate and also of his counsel, proceeded, with a view to saving trouble and expense, to settle the estate as if it were solvent, that is, by paying to each creditor his *pro rata* share of the assets, and settled the estate accordingly. The complainant, on receiving his dividend, gave the defendant a receipt in full for his claim against the estate. Both the administrator and the complainant were, at that time, ignorant that the latter had, by presenting his claim within the nine months, obtained a preference as to payment over some of the other creditors.—*Held*, that complainant, who did not assert the priority of his claim, allowed the administrator to pay all the creditors without a protest, and accepted his own dividend, and voluntarily gave the administrator a receipt in full for his claim against the estate, was not, under the circumstances, entitled to relief in equity.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. James O. Clark*, for complainant.

*Mr. J. W. Taylor*, for defendant.

Miller v. Harrison.

THE CHANCELLOR.

The bill is filed by a creditor of the estate of John C. Johnson, late of Newark, deceased, against the administrator, to bring into this court, from the Essex orphans court, where they are pending, the accounts of the latter for settlement here, to the end that the complainant may be relieved from the effect of a receipt given by him to the defendant. That instrument, though purporting to be in full of his claim against the estate, was given on the receipt of only part of the amount due on the claim. The ground of relief is that the complainant accepted the dividend in ignorance, through concealment thereof from him by the defendant of his rights, which he insists entitled him to payment in full; and he claims that the defendant is therefore answerable to him for the balance of his debt. The claim, as proved June 19th, 1876, was $10,000. It was subsequently reduced by a payment of $3,300 which the complainant obtained from the estate out of the assets of the intestate's firm in New York. The amount of the dividend paid was on the whole claim, as proved, and was $4,094.40. The complainant complains that the defendant concealed from him the fact that the complainant was (as he claims to have been) entitled, with two other creditors, to preference over the rest of the creditors because they three alone had exhibited their claims, under oath, within the time designated in the order for limiting creditors, which the defendant had taken and published; and that the defendant, ignoring and keeping silence as to the advantage which the complainant had thus obtained, distributed the estate, which was sufficient to pay the three (but not all the creditors) in full, among all the creditors, and thus gave to those who had not come in within the limited period participation in the assets to which they were not by law entitled; and, on the other hand, paid to the complainant only part, instead of the whole of his claim, thus depriving him of the preference which he insists he had gained by his diligence. The intestate died on November 17th, 1875. Administration was granted to the defendant on the 22d of that month, and an order limiting creditors to nine months was taken on that day. The inventory was filed on August 5th, 1876. The

limited period expired on August 22d, 1876. A rule to show cause why the decedent's land should not be sold to pay debts was taken January 2d, 1877, and an order to sell was made in March following. The land was sold and the sale was confirmed on May 29th, 1877. On that day the administrator made a representation that the estate was insolvent, and a decree barring the creditors who had not come in within the nine months was made on the same day. From that time until the filing of the administrator's final account, no proceedings were taken in the orphans court, but the defendant distributed the estate among all the creditors, paying them a dividend of forty and ninety-hundredths per cent. of their claims. He afterwards filed his final account on December 30th, 1878. The complainant, who had received the dividend and given the defendant a receipt in full for his claim against the estate, filed exceptions, which were referred to a master in chancery on April 2d, 1879, and testimony was taken thereon, but further proceedings in the orphans court were stayed by the injunction of this court, issued on the filing of the bill. It appears that in the outset, and for perhaps the first six months of his administration, the defendant supposed that the estate would prove sufficient to pay all the creditors in full, but he soon afterwards found that it was not only insolvent, but would need care and management to make it pay any considerable dividend. The order to limit was applied for and taken on the suggestion of the surrogate that it was a proper and customary proceeding, and not in view of supposed insolvency. It was obtained on the same day on which the letters of administration were granted. No order barring creditors, however, was taken until May 29th, 1877, when the representation of insolvency was made. That order, then, was not taken until more than nine months after the expiration of the time limited for bringing in claims. The complainant and two other creditors exhibited their claims, under oath, within the time designated in the order limiting creditors. Afterwards, and before the order barring creditors was made, other creditors exhibited their claims, under oath, to the amount of about $25,000. The claims exhibited within the period designated in the order limiting

creditors, amounted to about $33,500, but they were subsequently reduced to about $23,000. The amount realized from the personal and real estate appears to have been about $37,400. In addition to the debts which were proved, there were others to a very large amount, believed to be genuine and correct, which the administrator therefore allowed. The undertaker's bill was among these. The estate was only sufficient to pay a dividend of forty and ninety-hundredths per cent. upon all the debts. After the representation of insolvency had been made, the surrogate suggested to the administrator, with a view to saving trouble and expense, the propriety of settling the estate in the same manner in which he would if it were solvent; that is, by agreeing with the creditors as to the amount of their dividend, and paying it without proceedings in court to establish it. The administrator, approving of the suggestion, and being advised by his counsel that it was safe to do so, acted upon it. Afterwards, and in the summer of 1878, an impediment having been thrown in the way of the settlement of the estate by an attachment or injunction, by which the payment to the defendant of a large amount of money coming to the estate out of the decedent's business partnership in the city of New York, was stopped, the complainant called a meeting of the creditors at the Pacific Bank in that city, and some of the creditors met there accordingly. The result of the meeting was an endeavor to get rid of the obstruction before mentioned, which was successful. The defendant and complainant were both present at the meeting. The former stated there that he could not tell definitely what the estate would pay, but that he thought it would pay from forty to fifty per cent. No question was asked of him, nor was anything said, so far as appears, as to the time when the claims were presented, and the defendant made no representation or statement on the subject. Indeed, there is no room to doubt that he supposed that all the *bona fide* creditors were entitled to participate ratably in the distribution of the assets, without reference to the time or manner of exhibiting their claims, and whether they exhibited them or not, so long as their claims were known to the administrator. After the restraint by legal proceedings in New

York, before mentioned, had been removed, he proceeded to the distribution of the assets among all the creditors, and paid the complainant his ratable proportion (and more than that, in view of what he had received in New York) on such division, part of it, $2,500, before, and the residue at the time of signing the receipt. The receipt, with the check for the residue of the dividend, was left for convenience, by the defendant, with Mr. Farrington, the decedent's late partner, at the office of the firm, in New York, where the complainant lived; the check to be delivered on the signing of the receipt. The complainant at first refused to accept the check and sign the receipt, on the ground that he thought that the estate should have proved sufficient to pay the debts in full, and he suspected that there had been mismanagement of the assets. Mr. Farrington urged him (not, however, by any means at the instance of the defendant in any way) to accept the check and sign the receipt, suggesting to him that if it should prove that there had been any fraud, or the estate ought to have paid more, he could obtain relief, notwithstanding the instrument acknowledged the receipt of the money " in full for his claim against the estate." The complainant then took the check and signed and delivered the receipt. He states the transaction as follows:

" Mr. Farrington represented to me that that was my dividend out of the estate; that that was what it could pay; I at first refused to sign the receipt, because it was a receipt in full, and I thought the estate could pay more; Mr. Farrington said if I could prove that the estate could pay more, I would not lose my standing in court—it would not debar me from coming into court; he said that the receipt in full was not binding upon me if the estate could pay more, or there was fraud; when I signed the receipt, I did not know that I had obtained a preference above the other creditors of the estate, as I have since been advised by my counsel [that I had.] "

The defendant neither saw nor communicated personally with the complainant, after he left the check and receipt with Mr. Farrington, until after the latter was signed, and in nowise urged or induced him to sign it. Indeed, it appears that he sought at one time to withdraw the check, because he was dissatisfied with the action of the complainant in obtaining satis-

Miller *v.* Harrison.

faction of $3,300 of his claim, as before mentioned, out of the assets of the estate in New York, and it was merely by persuasion of Farrington, who was anxious to have the matter settled, that he was induced to leave it. Though Farrington urged the complainant, as before stated, to accept the check and sign the receipt, it was not by procurement of the defendant, nor as his agent, nor in his interest. Farrington gives the reason himself. He says that he did it in the interest of peace,. and to end the matter.

The complainant seeks to set aside the receipt, to the end that, being relieved from it, he may compel the defendant to pay him the balance of his debt. He does not deny that he accepted the dividend and signed the receipt voluntarily, but bases his claim to relief on the ground that the defendant, as administrator, was his trustee, and was therefore in equity bound to acquaint him with the fact that he had obtained the preference which he now claims. Not only did the complainant voluntarily sign the receipt, but there is no charge of intentional fraud or concealment. Neither of the parties was aware that the complainant could claim such preference. The defendant appears to have managed the estate to the best advantage, having even advanced large amounts of his own funds, and incurred large personal liabilities, in his efforts to realize as much as possible for the creditors. He claims, and it seems justly, that his prudent and skillful management gained for the estate over $30,000. The distribution which he made was an equitable one. He paid to each of the *bona fide* creditors his just proportion of the assets, except that the complainant received more than his share. One of the creditors whose claim was not put in within the time fixed in the order to limit, was the estate of Benjamin B. Ludlam, deceased. It had a claim of over $23,000. Mr. Ludlam died in France, leaving two wills, but had no representative under either of them to exhibit the claim within the period fixed in the order. Another of the claims was the undertaker's bill of $459.50, which was not proved at all, but as to which, it should be added, the complainant waives all objection. If the complainant indeed had obtained the advantage which he

claims, it was a merely legal one, an advantage which he, of course, might have waived, and from enforcing which he might have been estopped in equity. If he had that advantage, the presumption that he knew it is quite as strong as the presumption that the defendant knew it; and if he consented that the defendant should distribute the estate by an equitable division among all the *bona fide* creditors, thus admitting others whose claims, apart from the legal advantage which he asserts, were as much entitled to payment as his, to a just participation in the distribution, he would, of course, in equity, be estopped from setting up his legal claim after the administrator had paid out all the estate in such distribution. He never made even an intimation that he had a preference until after the distribution had been made. He had abundant opportunity to assert his claim, and there was a good reason why he should have done so. At the meeting at the Pacific Bank there were present the representative of that bank, which subsequently received a dividend of $1,510.63; the president and cashier of the Newark Bank, which afterwards received a dividend of $3,039.76, and the representative of the Ludlam estate, to which was paid a dividend of $9,438.20, and none of those claims were exhibited within the time designated in the order to limit creditors. He must have seen that it was proposed to make distribution to them, but he made no objection, and permitted the defendant to pay to them, out of the assets, nearly $14,000, as their share of them, without any objection whatever. The complainant testifies that he did not know he had the advantage which he claims until afterwards, and after the distribution had been made, and not then until his counsel informed him of the fact. His hesitation in signing the receipt was not on account of his supposition or suspicion that he had a preference, but because he thought the estate ought to pay a larger dividend to all the creditors. His action in signing the receipt was purely voluntary. He relied on no assurance, representation or statement of the defendant in doing so. The defendant held out no inducement whatever to him to do it. In the absence of fraud, and even of knowledge, on the part of the defendant, the complainant is not, under the

Miller *v.* Harrison.

-circumstances, entitled to relief against the receipt.  Fair dealing between him and the defendant and the other creditors over whom he claims preference, required him to assert or give notice of his claim when he saw that the defendant, in ignorance of it,. proposed to pay a dividend to those other creditors.  His excuse for not doing so is that he did not know that he was entitled to it.  Neither did the defendant.  While an administrator would not, in the absence of conduct amounting to equitable estoppel,. be protected in ignoring the rights of a creditor who has obtained a preference, he is, nevertheless, in the absence of fraud, not bound to communicate to such creditor the fact that he has obtained it.  The administrator is generally, indeed, presumed to know and bound to regard the fact of the preference, and ignorance alone will not excuse him for disregarding it.  He will not, as before stated, be protected in disregarding it, though ignorant of it, in fact, unless the circumstances are such that equity should aid and protect him.  On the other hand, the creditor is bound to know for himself the existence of his right to preference, and if he fails to assert it, to the prejudice of the administrator, under circumstances which would amount to equitable estoppel, equity will not aid him against the administrator.  Where, as in this case, both parties were ignorant of the existence of the right and acted accordingly, and it would be inequitable to accord to the creditor relief against the administrator, it will, of course, be denied.

But, further, it does not appear that the complainant had, in fact, obtained the advantage which he claims.  The order to limit creditors was taken on November 22d, 1875.  The nine months therein designated as the time within which claims were to be brought in, expired on August 22d, 1876.  But no order barring creditors was made until the representation of insolvency was made, which was not till May 29th, 1877.  All the claims which were put in under oath, were so exhibited in the year 1876, before the order barring creditors was made, except that of the estate of Benjamin B. Ludlam, deceased, which was not put in under oath until 1878.  I regard it as the law that, since the revision of the orphans court act (March 27th, 1874), notwithstanding

Miller *v.* Harrison.

the making and publishing of an order to limit creditors and the expiration of the limited period, it is not too late to put in a claim, provided the order barring creditors has not been made. *Ryder* v. *Wilson's Exr.*, *12 Vr. 9* ; *Terhune* v. *White*, *7 Stew. Eq. 48.* Before the revision, the law provided that the creditor failing to exhibit his claim within the time designated by the rule to limit, should, after due notice of the rule had been given, be barred, except as to estate not inventoried or accounted for. *Nix. Dig. 653.* Proof of the rule and notice, and failure to exhibit, constituted a bar. *Ryan* v. *Flanagan, 9 Vr. 161.* It also provided that the orphans court might, on proof that notice had been duly given, make a final decree barring such creditors as had not exhibited their claims within the limited time, and that such decree should be conclusive as a bar. *Nix. Dig. 308.* But by the revision it is provided (*Rev. 764*) that after the expiration of the time limited in the order, the orphans court, upon proof that the notice has been duly published, may, by final decree, order that all creditors who have not brought in their claims within the time fixed in the order, shall be barred from any action therefor against the executor or administrator ; and it is also provided that any creditor who shall have neglected so to bring in his debt, demand or claim within the time so limited, shall, by such decree, be barred of his action therefor against the executor or administrator, except as to property he may find which is not accounted for. The act does not provide, as it did before revision, that the mere failure of the creditor to put in his claim shall bar him, but that the decree shall constitute the bar. The effect is practically to extend the time for exhibiting claims until the decree shall be taken. The complainant had not, in fact, any advantage over those creditors who put in their claims prior to the making of the order barring creditors. And though that order, by its terms, barred all who did not exhibit their claims within the nine months, if the law is as above stated, it was erroneous, and should, by its terms, have barred none except such as had not put in their claims before it was made.

The bill will be dismissed, with costs.